# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* SAINT JOSEPH'S HOSPITAL, INC. and CANDLER HOSPITAL, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. CV410-096 |
| UNITED DISTRIBUTORS, INC.; UNITED DISTRIBUTORS, INC. EMPLOYEE HEALTH BENEFIT PLAN; COMMERCE BENEFITS GROUP AGENCY, INC. d/b/a COMMERCE BENEFITS GROUP, INC.; THOMAS J. PATTON; and LINNIE P. REAVES, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## ORDER

The United States, which brought this action on behalf of Saint

Joseph's and Candler Hospitals under the False Claims Act (FCA), 31

U.S.C. §§ 3729, *et seq.*, moves to quash a Fed. R. Civ. P. 45 subpoena

issued by defendant United Distributors, Inc. ("UDI") to the Office of the

General Counsel for the Centers for Medicare & Medicaid Services

("CMS").[1]   Doc. 115.   Boiled down, the Government contends that an employer and its benefit plan engineered a sham insurance claim to fraudulently induce $341,802.09 of Medicare coverage of a fatally ill employee.   Medicare wants its money back.   Doc. 19.

UDI's subpoena, which commands CMS to provide a person for an organizational deposition on, *inter alia*, how CMS processes Medicare claims (UDI thus wants to discover support for its defenses), was issued by the United States District Court for the District of Columbia.   Doc. 115-2 at 1; doc. 118-5.   Only that court can quash it.   Fed. R. Civ. P.

---

[1]   CMS is not a third party to this litigation.   The Government is the plaintiff and CMS is part of an agency of the Government.   As stated in a United States Government Accounting Office report: "The Centers for Medicare & Medicaid Services (CMS), a component within the Department of Health and Human Services (HHS), is responsible for overseeing the Medicare and Medicaid program -- the nation's largest health insurance programs -- which benefit about one in every four Americans." http://www.gao.gov/new.items/d06750.pdf (site as of Nov. 12, 2012); *see also* doc. 120 at 3.

As the subpoena was served on a Government agency, not a third party, the Government does not "lack[] standing" to contest the subpoena, as UDI asserts.   Doc. 118 at 9.   *See Pleasant Gardens Realty Corp. v. H. Kohnstamm & Co., Inc.*, 2009 WL 2982632 at *2-5 (D.N.J. Sept. 10, 2009) (Department of Justice had standing to file motion for protective order on behalf of EPA and former EPA employees who possessed government information); *see also United States v. Kashmiri*, 2011 WL 1326373 at *4 (N.D. Ill. Apr. 1, 2011) (in a criminal prosecution, the Department of Justice had standing to quash a subpoena targeting another federal agency in the Executive Branch); *Virgin Islands v. Milosavljevic*, 2010 WL 7371468 at *1 (V.I. Sept. 15, 2010) (same).

45(c)(3); *S.E.C. v. CMKM Diamonds, Inc.*, 656 F.3d 829, 832 (9th Cir. 2011); *Boy Racer, Inc. v. John Does 1-34*, 2012 WL 1535703 at * 3 (S.D. Fla. May 1, 2012). Nor, for that matter, could that court transfer the matter to this Court. *In re Sealed Case*, 141 F.3d 337 (D.C. Cir. 1998) (district court that issued subpoena lacked authority to transfer motion to quash to district court where trial was to take place); *but see Melder v. State Farm Mut. Auto. Ins. Co.*, 2008 WL 1899569 at * 4 (N.D. Ga. Apr. 25, 2008) (circuit split on transferability issue, Eleventh Circuit has not yet ruled). The Rule 45(c)(3) motion is therefore **DENIED** on procedural grounds. Doc. 115.

The substance of what the Government seeks to block here under its Fed. R. Civ. P. 26(c) motion for protective order matches what it seeks to block under Rule 45(c), and that's not surprising since "[t]ypically, analysis of Rule 45(c)(3)(A) motions is similar to analysis of Federal Rule of Civil Procedure 26(c) motions for a protective order." *Savant Systems, LLC v. Crestron Electronics, Inc.*, 2012 WL 987404 at * 3 (E.D. Pa. Mar. 22, 2012). Can this Court nevertheless reach the Government's "quash" objections through its 26(c) motion?

A majority of courts say yes, although no binding authority has been cited either way on this point.   As one court explains:

> Notwithstanding the Rule 45(c)(3) principle that the district court which issues the subpoena has the exclusive authority to rule on motions to quash or modify the subpoena, this Court has the authority and responsibility to control the broad outline and scope of discovery in the case. Thus, when a party files a motion for protective order in this Court which would have the effect of quashing or modifying a subpoena issued from another district, this Court may entertain that motion where (1) the issues raised are central to the case and extend beyond the specifics of the particular subpoena, and (2) the requested ruling is necessary to insure that general discovery issues will receive uniform treatment, regardless of the district in which the discovery is pursued. Certainly, this Court has the obligation to insure that another district does not broaden the scope of discovery beyond what would be allowed in this Court or otherwise enter an order that would be inconsistent with the scope of discovery already drawn by this Court . . . .

*Rajala v. McGuire Woods*, 2010 WL4683979 at * 7, (D. Kan. 2010) (quoted in *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Porter Hayden Co. of Pittsburgh, Pa.*, 2011 WL 6026291 at * 5 (D. Nev. Dec. 2, 2011)); *accord Platinum Air Charters, LLC v. Aviation Ventures, Inc.*, 2007 WL 121674 at * 1 (D. Nev. Jan. 10, 2007); *Straily v. UBS Fin. Services, Inc.*, 2008 WL 5378148 at * 2 (D. Colo. Dec. 23, 2008); *Wells v. GC Services LP,* 2007 WL 1068222 at * 1 (N.D. Cal. Apr. 10, 2007);

*Butterworth v. Jones Chemicals, Inc.*, 1993 WL 388645 at * 6 (M.D. Fla. Mar. 4, 1993).

"[T]he party who files the motion for protective order must bear the burden to show why this Court should depart from the general rule of not exercising jurisdiction over subpoenas issued from other jurisdictions and to persuade the Court why it is necessary for the Court to entertain the motion for protective order to control the broad outline and scope of discovery."   *Rajala*, 2010 WL 4683979 at * 7 (quoted in *Pro Fit Management, Inc. v. Lady of America Franchise Corp.*, 2011 WL 765836 (D. Kan. Feb. 25, 2011)); *High Point SARL v. Sprint Nextel Corp.*, 280 F.R.D. 586, 594 (D. Kan. 2012) (movant failed to make that showing).

Has the U.S. made that showing?   Some background, taken from UDI's summary judgment motion and accepted as true for the purposes of this Order, drives the answer and also the result reached below:

> [UDI] is a privately owned beverage distribution company based in Smyrna, Georgia.   The company employs about 140 people in the Savannah area.   Linnie Reaves is the Human Resources Director for [UDI]. [UDI] is not a healthcare company, and neither [UDI] nor Ms. Reaves has any specialized knowledge about health insurance or the Medicare program.

At the center of this case is Willie J. Archer ("Mr. Archer"), a [UDI] employee, who fell on the job while working on March 12, 2008 and was admitted to Candler Hospital for emergency treatment and was transferred to St. Joseph's Hospital, where he died on May 27, 2008.

Mr. Archer was both a Medicare beneficiary and a participant in [UDI's] Employee Health Benefit Plan ("the Plan"). Defendant Commerce Benefits Group Agency, Inc. ("Commerce Benefits") is the Third Party Administrator ("TPA") for the Plan, and Defendant Thomas Patton is the President of Commerce Benefits.[2]

Because Mr. Archer was injured on the job, [UDI] submitted a claim for Workers' Compensation benefits for Mr. Archer to the carrier, AIG Domestic Claims, Inc., and to the State Board of Workers' Compensation.   AIG denied the claim on March 26, 2008.

As Ms. Reaves was upset by the Workers' Compensation denial, she called Mr. Patton in early April 2008 and expressed concern that the Plan would deny Mr. Archer's medical bills and that the Archer family would have no compensation from Workers' Compensation. Mr. Patton advised Ms. Reaves not to appeal the Workers' Compensation denial and informed her that the Plan would pay the claims and could assist with compensation benefits as well. He also said he wanted to speak with the Archers. Later that day, April 4, 2008, Mr. Patton informed Ms. Reaves that he had spoken with Mr. and Mrs. Archer, and that they had declined leave under the Family Medical Leave Act ("FMLA") and elected COBRA continuation coverage under the Plan.

The brief calls on April 4, 2008, between Ms. Reaves and Mr. Patton lasted less than fifteen minutes in total. On April 5, 2008, Mr. Patton sent an email to Ms. Reaves, attaching a letter addressed to

---

[2]   These two defendants just moved for summary judgment. Doc. 135.

Mrs. Archer which documented the Archers' COBRA election.   Mr. Patton has maintained that Mrs. Archer elected COBRA on behalf of her husband during this phone call with Mrs. Archer, and has repeatedly assured Ms. Reaves and [UDI] that COBRA was elected. Ms. Reaves had no reason to question Mr. Patton's statements; he was the President of Commerce Benefits, the TPA for [UDI's] Plan, and he had expertise about insurance benefits.

Doc. 133 at 3-5 (cites omitted; footnote added); doc. 135 at 2-10 (co-defendants' summary judgment brief supplying minute-by-minute detail aimed at showing that at most honest confusion and negligence, not fraudulent intent, precipitated the Medicare payments).

Claiming violations of the FCA and Georgia common law causes of action, doc. 19, the Government alleges that no COBRA election was made for Mr. Archer, that the defendants created a "sham" COBRA election so that Medicare would pay Mr. Archer's bills, and that the Plan should have been the primary payor.   Doc. 19; *see also* doc. 115 at 3-4 ("Defendants created a sham COBRA election and instructed multiple health care providers to submit their claims related to the employee's care to Medicare for primary payment. . . a total of 180 claims were submitted to Medicare for primary payment, for which a total of

$341,802.09 was improperly paid out by Medicare."); doc. 120 at 5 n. 2.[3]

On its three FCA Counts the U.S. must prove: "(1) that the Defendants made a claim, or made a statement in order to get the Government to pay money on a claim; (2) that the claim or statement was false or fraudulent; and (3) that the Defendants knew that the claim or statement was false or fraudulent. *See* 31 U.S.C. § 3729(a)(1)(A)-(B)." *U.S. ex rel. Parato v. Unadilla Health Care Center, Inc.,* 787 F. Supp. 2d 1329, 1339 (M.D. Ga. 2011); *see also id.* (innocent mistakes or negligence by claimant are not actionable under the FCA, nor are imprecise statements arising from a disputed legal question).   The U.S. contends that

> [m]any of the facts in this case are not even in dispute.   The only relevant issue in this case is whether there was a valid COBRA election made by, or on behalf of, the UDI employee in question. As the [U.S.] will demonstrate, there was not and, therefore, the claims for payment that Defendants caused to be submitted to Medicare were false.   Accordingly, [they] are liable under the FCA.

Doc. 115 at 4.

Seeking information and evidence to defend against these claims,

---

[3]   UDI and Ms. Reaves filed their Motion to Dismiss the Complaint, which remains pending.  Docs. 39, 59, 77.  No Answer has yet been filed. The parties completed discovery on October 4, 2012.

UDI served CMS with its Rule 45 subpoena and Fed. R. Civ. P. 30(b)(6) notice, including a document request, for CMS to produce a person to testify on the following topics:

1. CMS's authority to make conditional Medicare payments under the Medicare Secondary Payer [(MSP)] statute, 42 U.S.C. § 1395y(b)(2)(B), when a group health plan has not made prompt payment for inpatient hospital or physician services and supplies.

2. A hospital's rights and responsibilities under the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b), relating to claims for inpatient hospital services and supplies provided to a Medicare beneficiary who is also a participant in a group health plan, whether by virtue of active employment or COBRA continuation coverage.

3. CMS's right to reimbursement, and its process and procedures for recovering reimbursement, of conditional payments made pursuant to the Medicare Secondary Payer statute, 42 U.S.C. § 1395y(b)(2)(B).

4. Documents, ESI and things produced in response to this subpoena.

Doc. 115-2 at 2; *see also id.* at 4-6 (documents requested, including documents specifically generated by, and reflecting, Archer's Medicare coverage).

The Government opposes this Rule 30(b)(6) quest and wants a protective order against it on three grounds: (1) it is irrelevant because this goes to the MSP statute, which is not at issue in this case, doc. 115 at

4; (2) having itself retained an expert, UDI now improperly seeks an unretained expert opinion from CMS, and that is prohibited by Rule 45(c)(3)(B), *id.* at 5-8; and (3) the 30(b)(6) effort is cumulative and duplicative, putting the Government to undue expense. *Id.* at 8-9 (UDI has already learned plenty from a deposition witness furnished by the Government, plus it would consume needless substantial resources to find an employee qualified to respond). These arguments are substantial, and with them the Government has made its *Rajala* showing, thus warranting invocation of the Court's authority under Rule 26(c) to control the broad outline and scope of discovery here. *Rajala*, 2010 WL 4683979 at * 7.

Opposing the motion for a protective order, UDI insists that testimony on how CMS processes claims under the MSP statute in fact is relevant to this case, as are CMS's communications with Archer's wife, St. Joseph's hospital, or others about the claims submitted to Medicare. Doc. 118 at 2-3. Mrs. Archer called Medicare to inquire and thus CMS' testimony about that is essential to develop facts that may cast doubt on

the Government's claims.[4]   *Id.* at 3.   UDI recounts extensive efforts to work with the Government on this matter, *id.* at 3-4, and it found the Government's deposition witness unqualified to answer its questions. *Id.* at 4.

Pointing to the documents portion of its subpoena/Rule 30(b)(6) request, UDI also insists that it does not seek expert witness testimony from CMS, only "factual information on several subjects including its experience and approach to the MSP statute in this setting, and communications about Mr. Archer's claims." *Id.* at 5.  UDI further points out that the Government has not objected to the documents portion of the subpoena, only the Rule 30(b)(6) deposition.  *Id.* at 7. Nor has it moved for a stay.  *Id.*

What cannot go overlooked is the current posture of this case. Despite the Government's refusal to comply with the subpoena and deposition notice, all of the defendants have been able to file comprehensive    summary    judgment    motions    disposing    of    the

---

[4]   As the Government points out, that's not what the Rule 30(b)(6) specification says. Doc. 120 at 5.   However, point (4) of UDI's Rule 30(b)(6) topic specification references documents relating to how CMS handled the Archer paperwork, and arguably that is enough.

Government's case outright.   And in those motions they mention this dispute only in passing (doc. 133 at 6; doc. 135-1 at 7 n. 2), while insisting that the district judge is otherwise fully entitled to, and should, grant complete judgment in their favor.   Doc. 133 at 25; doc. 135-1 at 24-25.

The briefing reveals three areas that UDI seeks to discover on the Rule 30(b)(6) deposition: (1) "process" information, as in how CMS generally handles claims in the context surrounding this case; (2) what CMS *actually* did in this case (hence, UDI's document subpoena and point (4) of its Rule 30(b)(6) specification on what the witness should be prepared to testify about); and (3) legal contentions, such as what the Government considers to be permissible versus fraudulent conduct given specific regulatory transactions.

As for points (1) and (3), the Court **GRANTS** the protective order motion to the extent UDI is attempting to elicit through Rule 30(b)(6) what is more practically obtainable through written contention interrogatories.   *See Louisiana Pacific Corp. v. Money Market 1 Institutional Inv. Dealer*, 2012 WL 3939337 at * 7 (N.D. Cal. Sep. 10, 2012) (collecting cases banning use of Rule 30(b)(6) to do the service of

contention interrogatories); *Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC*, 2007 WL 4139466 at * 5 (N.D. Ga. Nov. 14, 2007) (limiting deposition notice to how insurer applied its underwriting guidelines to that case; barring pursuit of testimony on the general issue or how it interpreted or applied its guidelines).[5]

The district judge, in resolving the summary judgment motions, will be in the best position to apply Fed. R. Civ. P. 56(g), the counterpart to Rule 56(d), in determining whether this deposition is dispensable on point (2) above, so the Court will **DEFER** ruling on that part of the government's motion for a protective order.  Doc. 115.  In the meantime, the Government has shown no good cause to block the documents defendants demand, so the Court **DENIES** that part of its motion and **DIRECTS** it to comply promptly.  Doc. 115.  Under this Court's liberal briefing policy, the defendants are free to supplement

---

[5] UDI does not dispute that its questions cover much of the same material discussed by its expert, John C. Garner.  (Doc. 115-2 at 1-10 (expert report); doc. 118 at 13 (UDI's response).)  Essentially, UDI seeks testimony from a non-designated expert, but as another court has explained, it is improper to use an organizational deposition to "try to force a non-designated expert to embrace the trial opinions expressed by the parties' own designated experts."  *U.S. ex rel. Tiesinga v. Dianon Systems, Inc.*, 240 F.R.D. 40, 43 (D. Conn. 2006).

13

their summary judgment briefs using any new documents they receive.

    **SO ORDERED** this _14Th_ day of November, 2012.

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA