# IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

UNITED STATES OF AMERICA ex )
rel. SAINT JOSEPH'S )
HOSPITAL, INC. and ex rel. )
CANDLER HOSPITAL, INC., )
 )
    Plaintiffs, )
 )
v. )    CASE NO. CV410-096
 )
UNITED DISTRIBUTORS, INC.; )
UNITED DISTRIBUTORS, INC. )
EMPLOYEE HEALTH BENEFIT )
PLAN; COMMERCE BENEFITS )
GROUP, INC., d/b/a Commerce )
Benefits Group; THOMAS J. )
PATTON; and LINNIE P. )
REAVES; )
 )
    Defendants. )
 )

FILED
U.S. DISTRICT COURT
SAVANNAH DIV.
2015 DEC -7 PM 2:38
CLERK
SO. DIST. OF GA.

## O R D E R

Before the Court are Defendants' Motions for Summary Judgment (Doc. 133; Doc. 135) and Defendants Linnie P. Reaves, United Distributors, Inc., and United Distributors, Inc. Employee Health Benefit Plan's[1] Motion for Oral Argument (Doc. 151). For the following reasons Defendants' Motions for Summary Judgment (Doc. 133; Doc. 135) are **DENIED**. As a result, the Motion for Oral Argument (Doc. 151) is **DISMISSED AS MOOT**.

---

[1] For purposes of this order, Defendants United Distributors, Inc.; United Distributors, Inc. Employee Health Benefit Plan; and Linnie P. Reaves will be referenced collectively as the "United Defendants." Defendants Commerce Benefit Group, Inc. and Thomas J. Patton will be referenced collectively as "Commerce Defendants."

## BACKGROUND

This case is a qui tam action under the False Claims Act ("FCA"), 31 U.S.C. § 3729,[2] brought by two Savannah area hospitals: Saint Joseph's Hospital, Inc. ("St. Joseph's") and Candler Hospital, Inc. ("Candler").[3] The Government has intervened and filed its own complaint.[4] The claims relate to alleged Medicare[5] fraud orchestrated through an purportedly false COBRA[6] election for Defendant United Distributor's employee,

---

[2] This case originally included three other claims: conspiracy under the FCA, and common law theories of unjust enrichment and payment by mistake of fact. These claims were dismissed in a January 11, 2013 order. (Doc. 166). In that order, this Court granted the Government fourteen days to submit an amended complaint. (Id.) The Government, however, elected not to file an amended complaint. (Doc. 167.) Therefore, the claims remain dismissed and are no longer before this Court.

[3] The hospitals, while separate legal entities, operate under a joint operating agreement and are therefore occasionally referenced as St. Joseph's/Candler.

[4] Previously, the parties stipulated to the dismissal of St. Joseph and Candler's claims alleging non-FCA violations of ERISA. (Doc. 112.) Because those claims have been resolved and only the FCA claims remain, the Court will refer to the Government's complaint (Doc. 19) as the complaint.

[5] Medicare is a program administered by the Center for Medicare and Medicaid Services. In this program, individuals who are age 65 or older, or disabled, may enroll in Medicare to obtain health benefits in exchange for payments of monthly premiums. 42 U.S.C. §§ 1395j, 1395o, 1395r.

[6] The Consolidated Omnibus Budget Reconciliation Act ("COBRA") provides employees, retirees, spouses, and dependents the right to elect temporary continuation of health coverage at group rates when coverage is lost due to certain qualifying life events. 29 U.S.C. §§ 1161-63. COBRA also outlines how employees and family members may elect continuation coverage. In cases where an individual of the age of 65 elects COBRA continuation coverage Medicare becomes the primary insurer in which case the group health plan and Medicare are switched—Medicare would serve

2

W.A.[7] Beginning in November 2001, W.A. worked as a truck driver for Defendant United Distributors, Inc. ("United") and received primary health insurance through United Distributors' health plan—United Distributors, Inc. Employee Health Benefit Plan ("United Health Plan"). (Doc. 19 ¶ 23.) While at work on March 12, 2008, W.A. lost consciousness, fell, and injured his head. (Id. ¶ 24.) After being taken to the emergency room at Candler, W.A. was transferred to St. Joseph's for diagnosis and, ultimately, brain surgery to remove a subdural hematoma. (Id. ¶¶ 24, 25.) Following the surgery, W.A. began to complain of stomach pain. (Id. ¶ 26.) W.A's physicians determined he was suffering from an unrelated colon rupture, for which he underwent another surgery. (Id. ¶ 27.) Unfortunately, a widespread infection was detected shortly after the colon surgery and W.A.'s condition deteriorated rapidly. (Id. ¶ 28.) By the end of March 2008, W.A. became unconscious and fell into a coma. Two months later on May 27, 2008, W.A. died. (Id. ¶ 29.)

---

as the primary health insurance and the group health plan would serve as secondary coverage. 29 U.S.C. § 1166; 48 C.F.R. § 1652.204-71; 42 C.F.R. § 411.175(a). Prior to any election and upon the occurrence of a qualifying life event, employers are required to provide notice to employees or family members of how and when such continuation coverage is available. 29 U.S.C. § 1166.

[7] The parties have requested the Court only refer to United Distributor's employee by the initials, W.A. The Court will refer to W.A.'s wife as Mrs. A.

Upon learning of W.A.'s injury, Defendant United submitted claims for W.A.'s medical care through a workman's compensation program. (Id. ¶ 33.) After the claims were denied (id. ¶ 34), Defendant Linnie P. Reaves ("Reaves") contacted Defendant Thomas J. Patton ("Patton")—President of Defendant Commerce Benefits Group Agency, Inc. ("Commerce"), the third-party administrator of the United Health Plan[8]—to discuss whether the Plan would also deny W.A.'s medical bills. (Doc. 133, Attach. 4 at 6-10.) On that same day, April 4, 2008, Defendant Patton called Mrs. A to discuss with her how the medical expenses would be reimbursed. (Doc. 19 ¶ 37.) Defendants Patton, Reaves, United, and Commerce all allege that in this phone call Mrs. A verbally declined leave under the Family Medical Leave Act and elected COBRA continuation coverage, which resulted in Medicare operating as the primary insurance payer. (Doc. 133 at 4-5.) Defendant Patton's conversation with Mrs. A lasted less than five minutes. (Doc. 133, Attach. 5 at 4-6.) While Mrs. A acknowledges that a phone call occurred in April of 2008, she now alleges that she was neither asked to nor elected COBRA. (Doc. 162, Attach. 1 at 33-36.) Nevertheless, Defendant Patton contacted Defendant Reaves after this conversation and informed her of Mrs. A's purported election. (Doc. 133, Attach. 3 ¶¶ 15-20; Doc. 133,

---

[8] At the time of W.A.'s injury, Defendant United maintained another entity—ADP—as its third-party administrator of the COBRA plan.

4

Attach. 5 at 5.) In a letter to Mrs. A dated April 4, 2008, which Mrs. A alleges she did not receive (Doc. 141, Attach. 6 at 30), Patton wrote that

> [i]t was a pleasure to speak with you, via phone, today. After our call, I spoke with [Reaves] and explained that you and I agreed that the best manner to handle the Workers' Compensation denial is to have you submit all claims through the Medical Plan. In the Unistan Health Plan System we show [W.A.]'s last day on the job as his COBRA effective date, because he chose not to take Family Medical Leave Act. Therefore, all claims will go first to Medicare and then to the Unistan Health Plan. [Mrs. A], the important point is that you will not pay anything for any medical services.

Defendant Patton then sent an email to Defendant Reaves with a copy of the letter and a message indicating that "[t]his worked out quite well, as [W.A.] is over 65 and United will only have to pay the balance of what Medicare does not cover." (Doc. 19, Attach. 1 at 4.)

According to the Government, after receipt of the letter Defendant Reaves failed to notify anyone of Mrs. A's COBRA election. (Doc. 19 ¶ 40.) No COBRA election forms were ever signed or executed. (Id. ¶ 42.) In fact, Defendant Reaves completed and certified an employment verification form for W.A. on May 14, 2008 that indicated his health benefits were covered by the United Health Plan. (Id. ¶¶ 46, 47.) Notably, the COBRA coverage box was not selected. (Id.) Defendant Patton, however,

notified Commerce's eligibility department of the purported COBRA election by e-mail. (Doc. 141, Attach. 6 at 29.)

W.A. died on May 28, 2008 and his medical expenses totaled $1,335,458.88. (Doc. 19, Attach. 1 at 8.) The day after W.A. died, Patton directed Defendant Commerce to inform St. Joseph's that the United Health Plan would not be serving as primary payer because W.A. had elected COBRA coverage. (Doc. 19 ¶ 50.) This was the first time that Commerce had made such a statement. (Id.) Both the United Defendants and Commerce Defendants then spoke with a number of medical providers, including Deborah Campbell from Saint Joseph's/Candler (Doc. 162, Attach. 2 at 15) and Patricia Shows of Cardiothoracic Surgery of Savannah (Doc. 162, Attach. 4 at 20), informing them of the election. Defendant Reaves, for example, stated that Commerce had the required COBRA paperwork, and Commerce advised St. Joseph's that W.A. or Mrs. A had signed a COBRA election form and that all bills should be processed through Medicare as primary payer. (Doc. 19 ¶¶ 51-52.) At least two of the providers challenged the validity of the election at the time they were informed, stating that they had no knowledge of Medicare's obligation to pay as the primary insurer. (See, e.g., Doc. 162, Attach. 4 at 20.)

Medicare initially declined to pay the medical bills, purportedly because it had not yet been informed that Mrs. A had elected COBRA. (Doc. 135 at 7.) For an unknown reason, Medicare

6

eventually reversed its decision and made payments as the primary payer. (Doc. 135 at 7; Doc. 19 ¶¶ 55, 58.) Medicare paid Candler $556.46 and St. Joseph's $318,423.97. (Doc. 19 ¶¶ 54-55.) Additionally, nearly two hundred claims for various physicians' services were submitted to Medicare due to Defendant Commerce's instructions to physicians to bill Medicare as the primary payer, for which Medicare paid $22,821.66. (Id. ¶ 58.) The total amount paid by Medicare was $341,802.09. (Id. ¶ 59.)

In June 2008, Defendant Commerce took over ADP's role as third-party COBRA administrator for Defendant United. (Doc. 135 at 8.) Because W.A.'s death operated as an independent qualifying event that allowed Mrs. A to elect COBRA for herself, Defendant Commerce sent a new letter to Mrs. A explaining her options for continuing medical coverage. (Doc. 141, Attach. 8 at 3.) Mrs. A engaged an insurance agent named Sheila Bowen to help her make a decision. (Id. at 6.) In a July 2, 2008 phone call, Commerce explained to Mrs. A that she was covered as a result of the election she had made for her husband. (Id.) At the time, Mrs. A did not dispute Commerce's statement that she had previously elected COBRA for her husband. (Id.) Ultimately, Mrs. A chose not to accept COBRA for herself. (Doc. 135 at 9.) In a September 25, 2009 phone call with Defendant Patton, Mrs. A spoke generally regarding her husband's insurance coverage at the time of his injury and death, but never directly informed

7

Commerce that she had not made a COBRA election on his behalf. (Doc. 135 at 9; Doc. 141, Attach. 9 at 29.)

The Government brought this suit to recover monies paid for alleged false claims presented to the Medicare program. The Government's complaint asserts two remaining causes of action: Count One alleges violations of the FCA under 31 U.S.C. § 3729(a)(1) and Count Two alleges violations of the FCA under 31 U.S.C. § 3729(a)(2). The Government alleges that, upon his initial hospitalization, W.A. provided documentation to both Candler and St. Joseph's that his primary health insurance coverage was provided by the United Health Plan. (Doc. 19 ¶ 30.) W.A. executed an assignment of benefits form authorizing Candler and St. Joseph's to seek and receive payments directly from the United Health Plan. Nowhere on these forms, however, was there an indication that the primary health insurance coverage was Medicare. (Id. ¶ 31.) As a result, the Government claims that the purported COBRA election of Mrs. A was falsified by the United and Commerce defendants to avoid covering W.A.'s medical bills as primary payer.

## ANALYSIS

I. <u>SUMMARY JUDGMENT STANDARD</u>

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought."

Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that

9

there is a genuine issue as to facts material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

## II. MOTION FOR SUMMARY JUDGMENT

In Count One, the Government alleges a violation of 31 U.S.C. § 3729(a)(1),[9] which creates liability for any person who "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval." To establish a cause

---

[9] The complaint asserts claims under an older version of the FCA, 31 U.S.C. § 3729 (2009). The section has been renumbered and amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21, § 4(a), 123 Stat. 1617. As to Count One, however, the former language is identical to the amended language. See 31 U.S.C. § 3729(a)(1)(A).

10

of action under this statute, the United States "must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc., 433 F.3d 1349, 1355 (11th Cir. 2005). Count Two alleges that Defendants violated 31 U.S.C. 3729(a)(2)[10], which imposes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

First, the United Defendants argue that there is no evidence of a "knowing" violation for either count. (Doc. 133 at 6.) Second, the United Defendants contend that the Government has no evidence of causation—a required element of Count One—or that any statements made by the United Defendants materiality affected the submission of a false or fraudulent claim—a required statutory element of Count Two. (Id. at 16.) Third, the United Defendants maintain that the claims submitted to Medicare on behalf of W.A. were not false because Medicare was obligated to make those payments as a primary insurer. (Id. at 22.)

---

[10] Former 31 U.S.C. § 3729(a)(2) was amended by FERA, making it retroactive to all claims pending on or after June 7, 2008, and codifying it as §3729(a)(1)(B). Publ. L. No. 111-21, §4(f)(1), 123 Stat. 1617, 1621. The complaint alleges Medicare claims for W.A. were pending on or after June 7, 2008. Thus, the FERA amendments are controlling as to Count Two and it is the new provision which is quoted above.

In the alternative, the United Defendants ask this Court for a ruling with respect to the allowable penalties under the FCA. (Id. at 24.) Specifically, they argue that any penalties assessed should be based on the number of "causative acts" rather than on the number of claims submitted to Medicare. (Id. at 24-25.) The Commerce Defendants likewise moved for summary judgment[11] on the basis that there is no evidence Defendants acted knowingly. (Doc. 135 at 11.)

A. Knowledge

Under the FCA, a person acts "knowingly" if "a person, with respect to information - - (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Importantly, the statute does not require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B).

1. Commerce Defendants

Based on the evidence presented, a reasonable jury could conclude that the Commerce Defendants did have actual knowledge of a false COBRA election. Defendant Patton has maintained

_____

[11] The Commerce Defendants did not raise the issues of causation or materiality in their initial motions for summary judgment, although they attempted to argue them in their reply brief. As a result, those arguments are waived. See Copeland v. Housing Auth. of Hollywood, 358 F. App'x 144, 144 (11th Cir. 2009) ("Failure to develop a legal argument in the opening brief waives our review.").

throughout this case that during an April 4, 2008 phone call Mrs. A elected COBRA for her husband. (Doc. 141, Attach. 4 at 9.) The Commerce Defendants also cite to Mrs. A's failure to inform either the Commerce Defendants or the United Defendants in later phone calls that she did not elect COBRA for her husband as evidence that she did, in fact, make such an election. (Doc. 135 at 8; Doc. 141 Attach. 8 at 6.) However, Mrs. A's behavior regarding the COBRA election is ambiguous at best. For example, in one conversation between Mrs. A, Sheila Bowen, and Anne from Commerce the following exchange occurred:

**Sheila Bowen:** Um – We're trying to get something straightened out. Her husband went – was uh – fell and went into the hospital and was put – uh – on COBRA

**Mrs. A:** March 12th

**Sheila Bowen:** on March 12th and he passed on May 27th. And we've got the certificate of health letter stating that the coverage ended on May 28th. However, she's talked with – um – a gentleman named Tom and he informed her

**Mrs. A:** Tom Patton

**Sheila Bowen:** Yea – she was covered. Um – to not worry about it so. And the lady we just talked to said she's covered under COBRA, but Ms. A doesn't understand because she's not paying a premium . . . .

13

(Doc. 162, Attach. 5 at 2-3.) Notably, Mrs. A never makes any affirmative statement regarding the validity of the COBRA election. Because of Mrs. A's ambiguous statements, the fact that she did not directly question a COBRA election is insufficient to warrant summary judgment for Defendants.

Even if Mrs. A's interactions with Commerce and United had been clearer and there were directly conflicting statements about the COBRA election in the record, this still would not have entitled Defendants to summary judgment. (Doc. 162, Attach. 1 at 33-36.) Conflicting statements can, and often do, create a triable issue for the jury. See Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980) ("A genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition.").[12] In this case, Mrs. A's conflicting and ambiguous statements regarding whether she had or had not elected COBRA operate to raise a triable question of material fact suggesting that the Commerce Defendants had sufficient knowledge under the FCA.

In the alternative, the Commerce Defendants cite to United States v. Am. Health Enters., Inc., 1996 WL 331106 (N.D. Ga. Apr. 24, 1996), for the proposition that they are not liable for

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

United's failure to properly document the COBRA election. (Doc. 135 at 13.) Under this line of reasoning, even if Mrs. A had not elected COBRA and Defendant Patton was merely mistaken as to her choice, it was the United Defendant's singular error in failing to file the appropriate COBRA paperwork that resulted in a false claim. (Id., Doc. 19 ¶¶ 40, 42.) However, that case is not applicable here.

In Am. Health, the defendants—Medicare providers—elected to receive periodic interim payments ("PIPs").[13] 1996 WL 331106, at *2. At some point the defendants' health care services were sold to another entity and, as a result, the defendants were no longer entitled to PIPs. The purchaser of the health care services filed paperwork with the Tennessee Department of Health and Environment notifying them of the change in ownership and the corresponding change in PIP payments. However, the Department failed to notify the Medicare program. As a result, the defendants continued to receive PIPs to which they were not entitled. When this receipt of PIPs was discovered, the defendants were charged under the FCA. They argued that they did not have the requisite scienter based on their belief that they had fulfilled their obligations under the Medicare notice regulations. Id. at *4. Additionally, the defendants noted that

---

[13] PIPs are "advance payments disbursed by an intermediary throughout the year, based on estimates of a provider's final reimbursable cost." Am. Health, 1996 WL 331106, at *2.

15

they were entitled to some PIPs post-sale, albeit much smaller PIPs than they actually received. Id. The defendants stated that, because they believed the appropriate notification had been made regarding the sale, they reasonably believed that the post-sale PIPs were valid. Id. The court agreed and granted the motion for summary judgment on the basis that there was insufficient knowledge by the defendants to support an FCA claim. Id. at *5.

In this case, the Commerce Defendants claim that they are also not liable under the FCA because they believed the United Defendants had sent the appropriate notification to formalize a COBRA election to Mrs. A. (Doc. 135 at 13-16.) Unfortunately, the facts in Am. Health are not parallel to the case at bar. In Am. Health there was no affirmative evidence of actual knowledge of wrongful receipt of PIPs on the part of the defendants. Here, however, there is direct evidence presented by Mrs. A that she did not elect COBRA. (Doc. 162, Attach. 1 at 33-36.) Accordingly, it is unnecessary to evaluate at this time whether it was the United Defendant's error that ultimately caused the submission of false claims. If Mrs. A's statement that she clearly never elected COBRA for her husband, and communicated that to Mr. Patton is correct, the error in this case occurred not at the notification state, as Commerce alleges, but rather at the election stage. Should that be the case, the fault rests

squarely on Commerce's shoulders.[14] Because this Court has concluded above that a reasonable jury could decide that Mrs. A did not make a COBRA election, Commerce's motion for summary judgment on the basis that Commerce lacked the requisite knowledge under the FCA must fail.

### 2. United Defendants

The Government identifies nothing in the record that would allow a reasonable jury to conclude that the United Defendants had actual knowledge of a false COBRA election at this time. The Government attempts to claim that a reasonable fact finder could conclude that the United Defendants had actual knowledge because Defendant Patton was aware of the false election and was in "close communication" with Defendant Reaves. (Doc. 157 at 23.) The Government also argues that "direct and circumstantial evidence," including the brevity of certain phone calls, suggests a conspiracy between these two individuals and supports its argument for actual knowledge. (Id.) However, all the Government actually presents in this regard is blind postulation based on a usual communication between an employer and third-party administrator. This cannot be sufficient to defend against a motion for summary judgment. See Atakora v. Franklin, 601 F.

---

[14] This does not eliminate the United Defendants of liability, but merely establishes that there is sufficient evidence to create a genuine issue of material fact as to whether the Commerce Defendants had sufficient knowledge of a false COBRA election.

App'x 764, 766 (11th Cir. 2015) ("Guesses or speculation which raise merely a conjecture or possibility are not sufficient to create even an inference of fact for consideration on summary judgment . . . .") (citing Hudson v. J.H. Harvey Co., 244 Ga. App 479, 480 (2000), 536 S.E.2d 172, 173 (2000). Employing similar logic, this Court previously dismissed the Government's claim of a conspiracy under the FCA based on the Government's failure to "provide factual allegations concerning statements or specific conduct made as part of the conspiracy." (Doc. 166 at 18.)

However, whether the United Defendants acted with deliberate ignorance or reckless disregard as to the COBRA election is another matter. Under the FCA, a defendant can be considered "knowingly liable" if they act in "reckless disregard" or "deliberate ignorance". 31 U.S.C. § 3729(b)(1). "Reckless disregard" was intended to capture "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted." Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1058 (11th Cir. 2015) (citing S. Rep. 99-345, at 21 (1986) as reprinted in 1986 U.S.C.C.A.N 5266, 5286. It was meant to apply to those "who act in gross negligence—those who fail to make such inquiry as would be reasonable and prudent to conduct under the circumstances." Id. (quotation

marks omitted). As the Eleventh Circuit has noted, "Congress did not intend to turn the False Claims Act, a law designed to punish and deter fraud, 'into a vehicle either punishing honest mistakes or incorrect claims submitted through mere negligence or imposing a burdensome obligation on government contractors rather than a limited duty to inquire,'." Urquilla-Diaz, 780 F.3d at 1058 (citing United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1274 (D.C. Cir. 2010) (internal quotations omitted)).

The United Defendants repeatedly cite to Defendant Reaves's communication with Defendant Patton for the proposition that "she was no more acting with deliberate ignorance or reckless disregard than was the relator Saint Joseph's/Candler Hospital, which relied on information from Commerce Benefits in submitting claims to Medicare." (Doc. 164 at 9.) They argue that her receipt of information from Defendant Patton regarding the alleged COBRA election and error in failing to file the paperwork was merely negligence. (Id.) As Reaves's activities were mere negligence, the United Defendants argue that they do not have the requisite knowledge required under the FCA.

The Court is mindful that simple negligence is not sufficient under the FCA to show reckless disregard. See Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1058 (11th Cir. 2015); United States v. Sci. Applications Int'l Corp., 626 F.3d

1257, 1274 (D.C. Cir. 2010). However, the Government has proffered more evidence than Defendant Reaves's mere negligence and the Court concludes that a reasonable factfinder could conclude the United Defendants acted with reckless disregard when they processed Mrs. A's alleged COBRA election. First, Defendant Reaves failed to confirm the COBRA election with Mrs. A. (Doc. 133 at 12-14.) Second, Defendant Reaves failed to file the appropriate paperwork to trigger a COBRA election with United's third-party COBRA administrator. (Id. at 15.) Third, Defendant Reaves did not question the appropriateness of the COBRA election when challenged directly by some of W.A.'s medical providers. (Doc. 162, Attach. 4 at 20.) In the face of this, the United Defendants should have done more than simply reconfirm a COBRA election from the individual who first notified the United Defendants of the election. At the very least, the appropriate paperwork should have been sent to confirm a COBRA election. These shortcomings are sufficient to create an issue of fact as to whether the United Defendants were acting with reckless disregard. See, e.g., United States v. Krizek, 111 F.3d 934, 942 (D.C. Cir. 1997) (finding presumptive liability where submissions were made with "little or no factual basis" or investigation).

B. Causation and Materiality

The United Defendants next argue that there is no evidence that either Reaves or United Distributors caused the submission of false claims. (Doc. 133 at 16.) It is not necessary for a defendant to submit the claim or be in contractual privity with the government to be subject to liability. U.S. ex rel. Keeler v. Eisai, Inc., 568 F. App'x 783, 794 (11th Cir. 2014). When proving causation for purposes of a claim under 31 U.S.C. § 3729(a)(1) where a provider "specifically directs the provider to submit the claim to Medicare for payment, or otherwise suggests to the provider that Medicare should be primary payer," there may be sufficient evidence of a claim. U.S. ex rel. Drescher v. Highmark, Inc., 305 F. Supp. 2d 451, 461 (E.D. Pa. 2004). When proving causation for purposes of a claim under 31 U.S.C. § 3729(a)(2), "[i]t is insufficient for a plaintiff to show merely that a false statement resulted in the use of Government funds to pay a false or fraudulent claim. Instead, a plaintiff . . . must prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim." Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1330 (11th Cir. 2009) (internal quotations omitted)(quoting Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662, 665, (2008); id. at 667.).

In this case, Defendants ignore the evidence presented that in at least two circumstances their statements regarding Medicare's responsibility as primary insured directly resulted in claims made to the Medicare system.[15] The Government has placed into evidence the contents of two exchanges between the United Defendants and health care service providers indicating that the United Defendants caused the submission of reimbursement claims to Medicare. In these exchanges, Defendant Reaves spoke with both Deborah Campbell[16] and Patricia Shows[17] and confirmed that there had indeed been a COBRA election for W.A., and that as a result, claims would be submitted to Medicare. (Doc. 162, Attach. 2 at 15-19; Doc. 162, Attach. 4 at 20.) More telling is a statement Deborah Campbell made in her deposition that, but for speaking with Ms. Reaves, the hospital would have continued to submit claims to the United Healthcare plan as primary because United's statement was necessary to verify the

---

[15] The Defendants were also aware that because of the purported COBRA election "United [would] only have to pay the balance of what Medicare does not cover," indicating they were aware that the COBRA election would result in claims made to Medicare. (Doc. 19, Attach. 1 at 4.)

[16] When asked why she contacted United Distributors Deborah Campbell stated "I am verifying that Medicare is primary, that information."

[17] Defendant Reaves noted in an email to Tom Patton that "[Patricia Showes] was trying to make me tell her when Willie actually went on Cobra, said she had just spoke with his spouse and she doesn't know anything about him being on Cobra. However, she did say that she just need's dates so she doesn't get anything sideways when she tries to collect from medicare [sic], with Commerce being secondary."

22

COBRA election as part of a routine process. (Doc. 162, Attach. 2 at 15-16.) See, e.g., U.S. ex rel. Duxbury v. Ortho Biotech Products, L.P., 579 F.3d 13, 29-31 (1st Cir. 2009) (reversing dismissal of claims where illegal kickbacks caused the submission of false claims to the government).

Likewise, the United Defendants argue that there is no evidence that any of the statements they made were material to the submission of a false claim. (Doc. 133 at 16.) For the same reasons as above, the Government has raised a plausible argument as to the materiality of the statements made by the United Defendants. "Material" under the FCA is defined as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The United Defendants' statements to both Deborah Campbell and Patricia Showes regarding the existence of a COBRA election on behalf of W.A. were material to the submission of the hospital's claims for reimbursement to Medicare. See also Duxbury, 579 F.3d at 30 (finding statements material to claim where made with the intent to cause submission to government). As a result, Defendant's request for summary judgment on the basis of causation or materiality is denied.

C. Falsity

The United Defendants also argue that the claims submitted to Medicare were not false. (Doc. 133 at 22.) According to the

23

United Defendants, the Medicare Secondary Payer Statute allows Medicare to "make [a] payment . . . with respect to an item or service of a primary plan . . . has not made or cannot reasonably be expected to make payment with respect to such item or service promptly." 42 U.S.C. § 1395y(b)(2)(B)(i). However, the United Defendants ignore the final sentence in the provision to which they cite. That sentence requires that "any such payment . . . shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions." Id. Here there is an inherent difference in Medicare's ability to make a "conditional payment" on the basis that an individual's primary plan cannot reasonably be expected to make a payment, and Medicare being required to assume primary payer position for that individual's coverage by virtue of a false COBRA election. The former is a statutory opportunity available at Medicare's discretion, the latter provides Medicare no such protection or option. This Court previously noted the novelty of this argument and rejected it in part as it would "incentivize a group health plan to avoid its legal obligation as the primary payer by simply asserting that Medicare-eligible employee in need of medical care simply elected COBRA, deny coverage, and then submit the claims to Medicare." (Doc. 166 at 15.) However, this does not make the claims any less false. (Id.) As a result, this Court concludes that Defendant's Motion

for Summary Judgment on the basis that they made no false claims must be denied.

### D. Allowable Penalties

In the alternative, the United Defendants request a ruling with respect to the penalties to be assessed under the FCA. (Doc. 133 at 24.) At this stage in the litigation, this Court concludes that the question of allowable penalties is not yet ripe for review. Because the issue of liability remains to be decided, any ruling in regards to penalties would be advisory at best. See Miller v. FCC, 66 F.3d 1140, 1145 (11th Cir. 1995)("Article III of the Constitution limits the jurisdiction of the federal courts to actual 'cases' or 'controversies.' Although 'those two words have an iceberg quality, containing beneath their surface simplicity submerged complexities which go to the very heart of our constitutional form of government,' the purpose of the requirement is readily apparent—to limit the federal courts to deciding issues presented in an adversary framework amenable to judicial resolution and to maintain separation of powers among the three branches of government." quoting Flast v. Cohen, 392 U.S. 83, 94-95 (1968))). As a result, this Court declines to issue a ruling as to the allowable penalties in this case.

**CONCLUSION**

For the foregoing reasons, Defendant's Motions for Summary Judgment (Doc. 133; 135) are **DENIED**. Defendant United Distributors Motion for Oral Argument (Doc. 151) is **DENIED AS MOOT**. This case will proceed to trial.

SO ORDERED this 7th day of December 2015.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA